2012 UT 75

**UTAH TRANSIT AUTHORITY, Plaintiff and Appellee,**

v.

**LOCAL 382 OF THE AMALGAMATED TRANSIT UNION, Defendant and Appellant.**

**No. 20100940.**

Supreme Court of Utah.

Nov. 6, 2012.

Scott A. Hagen, D. Zachary Wiseman, David B. Dibble, Salt Lake City, for appellee.

Joseph E. Hatch, Murray, Arthur F. Sandack, Salt Lake City, for appellant.

Justice LEE, opinion of the Court:

¶ 1 This case arises out of collective bargaining negotiations between the Utah Transit Authority and Local 382 of the Amalgamated Transit Union. Those negotiations came to a standstill in 2009, when the parties entered into arbitration and litigation to resolve their disputes. The district court granted UTA's partial motion for summary judgment in the ensuing litigation, and the Union appealed.

¶ 2 Before the matter could be addressed on appeal, however, the arbitrator entered a binding ruling largely in favor of the Union. With this ruling in hand, the parties once again entered into negotiations and successfully hammered out a new collective bargaining agreement. Because their dispute has since been resolved, the case is moot and we accordingly dismiss it.

I

¶ 3 UTA and the Union operate under a collective bargaining agreement (CBA) that largely defines the terms and conditions of employment of those UTA employees represented by the Union. Faced with the pending expiration of their collective bargaining agreement in December 2009, the parties entered into negotiations with the intent to come to terms on a new CBA. With an eye on December, the parties met over a dozen times during a span of several months. Quarrels arose between the two in late 2009, however, and on the eve of the agreement's expiration in December, UTA declared that the parties had reached an impasse despite attempts to negotiate in good faith. UTA then unilaterally modified the terms and conditions of its unionized employees' employment.

¶ 4 Along with the terms of their CBA, the parties are also subject to an "arrangement" under Section 13(c) of the Urban Mass Transportation Act of 1964. 49 U.S.C. § 5333(b) (2005). In the event the two are not able to reach an agreement after sixty days of negotiating over a collective bargaining agreement, the arrangement provides for two resolutionary measures: a period of fact finding and another for arbitration. With regard to fact finding, the arrangement requires that, until the fact-finding period has ended, "[t]he terms and conditions of any expiring collective bargaining agreement between the parties shall remain in place following expiration of such agreement, unless otherwise mutually agreed in writing by the parties." The 13(c) arrangement also provides for arbitration at the election of either party regarding its "application, interpretation, or enforcement."

¶ 5 Following their failed negotiations, the parties mutually elected to arbitrate the question whether the arrangement prohibited UTA from unilaterally modifying the terms and conditions of the Union members' employment. Although the Union proposed that the parties also arbitrate the question whether UTA actually bargained in good faith to impasse, UTA took the position that those issues were not within the scope of the arbitration clause, and accordingly declined to have them considered by the arbitrator.

¶ 6 Meanwhile, in April 2010, UTA filed a complaint for declaratory relief, requesting that the district court find that the disputes in question were not arbitrable and that the parties were at an impasse in their negotiations in December 2009. The Union responded by filing a motion to compel arbitration and to stay the judicial proceedings. On the heels of that motion, UTA filed a motion for summary judgment, asserting that UTA's unilateral modification of the Union members' terms and conditions of employment was an issue properly to be heard by a court and not by an arbitrator. The issues were briefed and the court conducted a hearing in July 2010.

¶ 7 Some weeks later, in September, the district court ruled on the matter, denying the Union's motion to compel arbitration and granting UTA's motion for partial summary judgment. The Union subsequently filed a motion to amend the court's ruling, which the parties jointly endorsed. The court accepted

the recommended changes, and entered an Amended Ruling on November 9, 2010.

¶ 8 Then, in December 2010, the appointed arbitrator rendered his decision, ruling that the parties' 13(c) arrangement prohibited UTA from unilaterally altering the terms and conditions of the expiring collective bargaining agreement until it had first entered into and completed the fact-finding procedures provided in the arrangement. As a result, the arbitrator concluded that UTA had to reinstate the terms and conditions of the 2009 collective bargaining agreement.

¶ 9 Following the arbitrator's ruling, in April 2011, the parties restarted negotiations and ultimately agreed on terms and entered into a new collective bargaining agreement. As of the time of oral argument, this collective bargaining agreement was still in effect. The Union filed a timely appeal, asking that we review the court's order denying the Union's motion to compel arbitration.

¶ 10 In July 2011, UTA filed a Suggestion of Mootness with the court, urging us to dismiss the appeal as moot because "there [was] no meaningful relief that [could] be granted." The Union disagreed, insisting that this court should reach the merits of the case in order to "eliminate a significant uncertainty regarding [the] process involving collecti[ve] bargaining between the UTA and the Union," to prevent future violations of this nature, and to serve the public interest "by resolving a significant conflict." UTA has since backed off its stance on mootness, arguing that, after some consideration, the case is only *mostly* moot. UTA now asks us to consider "the procedural question presented for appeal"—whether "an allegation of an unfair practice ... must be arbitrated or decided by a court."

¶ 11 We disagree with both parties and conclude that the case is moot. We accordingly dismiss it.

## II

██ ¶ 12 This case is moot. It became moot the moment the parties negotiated and entered into their new collective bargaining agreement. And because it is moot, we lack the power to address the underlying merits or issue what would amount to an advisory opinion.

¶ 13 Both parties urge us to ignore the mootness problem, however, and address some of the outstanding issues between them—to help them "fully understand what behavior is expected of them when negotiating the terms and conditions of a new collective bargaining agreement"; to "assist ... future negotiations" between them; and to sort out whether certain issues "must be arbitrated or decided by a court." In so arguing, both parties invoke a so-called "public interest exception" that purportedly opens the door to our review. And both parties suggest that issuing such a decision "would be an appropriate exercise of the Court's discretion." We disagree on all counts.

██ ¶ 14 Although the parties appear to have had standing and a ripe controversy when the case was filed in the district court, their subsequent negotiation and new collective bargaining agreement rendered the case moot and accordingly non-justiciable. As we recently explained, "[w]here the issues that were before the trial court no longer exist, the appellate court will not review the case. An appeal is moot if during the pendency of the appeal circumstances change so that the controversy is eliminated, thereby rendering the relief requested impossible or of no legal effect." *Navajo Nation v. State (In re Adoption of L.O.)*, 2012 UT 23, ¶ 8, 282 P.3d 977 (internal quotation marks omitted).

¶ 15 The parties do not contest that the Union has been restored to the status quo ante in the time the case has been pending on appeal. Because the arbitrator's ruling reinstated the Union's terms of employment and prompted the parties to enter into a new collective bargaining agreement, there is no remaining live controversy of any significance to the parties' current circumstances.[1] Put another way, the case is moot in that there remains no meaningful relief that this

---

1. *Mills v. Green*, 159 U.S. 651, 653–54, 16 S.Ct. 132, 40 L.Ed. 293 (1895) (noting that an appeal should be dismissed as moot where, by virtue of an "intervening event" the appellate court cannot "grant ... any effectual relief whatever" in favor of the appellant).

court could offer, such that anything we might say about the issues would be purely advisory.

¶ 16 Despite their acknowledgement of these foundations for a finding of mootness, the parties nonetheless encourage our resolution of the underlying issues on the ground that they are important and might speculatively resurface as a point of dispute between the parties in the future. We reject that invitation, and in so doing reiterate the contours of the doctrine of mootness and confirm its fundamental basis in article VIII of the Utah Constitution.

## A

¶ 17 The parties' principal position on appeal is to urge us to exercise a supposed discretion to override the traditional limitations of the law of mootness. Thus, while recognizing that the case is technically moot in the sense noted above, the Union (and to some extent UTA) frame the doctrine of mootness as a purely prudential principle of judicial discretion. And because they see the matter of mootness as a principle of our own creation, the parties insist that we have the power to abolish it at our whim, on the ground, for example, that the question presented is sufficiently important or interesting to merit our attention and to justify the clarification of Utah law through publication of an opinion.

¶ 18 That approach rests on a basic misconception of the source and nature of the doctrine of mootness. This doctrine is an element of the principles defining the scope of the "judicial power" vested in the courts by the Utah Constitution. It is not a simple matter of judicial convenience or ascetic act of discretion.

¶ 19 Our cases have long endorsed this position. One of our earliest explications of justiciability noted that "[e]ven courts of general jurisdiction *have no power* to decide abstract questions or to render declaratory judgments, in the absence of an actual controversy directly involving rights." [2] We have since reiterated that when a court "ascertain[s] that there is no jurisdiction in the court because of the absence of a justiciable controversy, then the court can go no further, and its immediate duty is to dismiss the action." *Baird v. State*, 574 P.2d 713, 716 (Utah 1978).[3] Thus, we have unequivocally declared that "courts are not a forum for hearing academic contentions or rendering advisory opinions." *Id.* at 715.[4]

¶ 20 These conclusions find support in the text and original understanding of the judicial power clause of the Utah Constitution. UTAH CONST. art. VIII, § 1. Under this provision, "[t]he judicial power of the state" is "vested in a Supreme Court, in a trial court of general jurisdiction known as the

2. *Univ. of Utah v. Indus. Comm'n of Utah*, 64 Utah 273, 229 P. 1103, 1104 (1924) (emphasis added) (citing *California v. San Pablo & T.R. Co.*, 149 U.S. 308, 314, 13 S.Ct. 876, 37 L.Ed. 747 (1893) ("[T]he court is not empowered to decide moot questions or abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it. No stipulation of parties or counsel, whether in the case before the court or in any other case, can enlarge the power, or affect the duty, of the court in this regard.")); *see also State v. Stromquist*, 639 P.2d 171, 172 (Utah 1981) ("This Court was not intended to be, nor is it endowed with authority to render advisory opinions, and has said so many times.").

3. Granted, some of our past cases include dicta characterizing mootness as a matter of "judicial policy" resting "in the discretion of this court." *See, e.g., Ellis v. Swensen*, 2000 UT 101, ¶ 26, 16 P.3d 1233; *see also Guardian ad Litem v. State ex rel. C.D.*, 2010 UT 66, ¶ 13, 245 P.3d 724. The discretion and policy at stake, however, are not a matter for standardless, case-by-case resolution, but instead are informed by the doctrine of mootness and its exceptions. We turn to the exceptions in part II.B. below, where we clarify the legal principles that guide judicial discretion in this area.

4. This conclusion enjoys ample support in the mootness doctrine of our federal counterparts. *See* Helen Hershkoff, *State Courts and the "Passive Virtues": Rethinking the Judicial Function*, 114 HARV. L.REV 1833, 1844 (2001) ("No rule of federal justiciability doctrine is more entrenched than the ban on advisory opinions."); *see also Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 103, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (Stevens, J., concurring) ("[W]henever we are persuaded by reasons of expediency to engage in the business of giving legal advice, we chip away a part of the foundation of our independence and our strength.").

district court, and in such other courts as the Legislature by statute may establish." *Id.* Alone, the text does little to reveal the precise scope of the judicial power. But it does make one fundamental point abundantly clear: The scope of our authority is not a matter for the courts to define at our preference or whim; we are constitutionally limited to wield only "judicial power" and may not act extra-judicially (regardless of how interesting or important the matter presented for our consideration).

¶ 21 As to the scope and meaning of the "judicial power," a page of state history sheds substantial light on what that power did—and *did not*—mean to the framers of our Utah Constitution. During the course of the state's constitutional convention, delegate Thomas Maloney proposed an amendment to article VIII that would have expressly authorized the Utah Supreme Court to issue advisory opinions when requested by the governor or legislature.[5] Utah Constitutional Debate, 23 April 1895 (*available at:* http://le.utah.gov/Documents/conconv/51.htm (last visited Oct. 30, 2012)). When questioned why he would propose such a clause, Maloney responded that it had "worked well" in other states (including Massachusetts, Maine, and Colorado) and that the legislature "may want an opinion" on matters of significance. *Id.* Two other delegates voiced their objection to the proposed amendment, however, and it was roundly rejected by the body of the convention. *Id.*

¶ 22 Had it adopted the provision, Utah certainly would not have been alone.[6] By 1895, several states had incorporated advisory opinion provisos into the judicial articles of their constitutions,[7] and one state supreme court—North Carolina's—had begun issuing advisory opinions "as a matter of courtesy, and out of respect to a coordinate branch of the government."[8]

¶ 23 But Utah also had plenty of company in rejecting such a provision. Several states had already discarded or abandoned the practice of issuing advisory opinions,[9] ruled their issuance to be beyond the scope of the judicial power recognized in their constitu-

---

5. The official minutes from this exchange read as follows:

> Mr. MALONEY. Mr. Chairman, I offer an additional section there as follows:
> The justices of the supreme court shall be obliged to give their opinion upon important questions of law and upon solemn occasions when required by the governor, senate or house of representatives.
> Mr. RICHARDS. I would like to know what states have adopted such a provision?
> Mr. MALONEY. Massachusetts, Maine, Colorado, and a number of others. The reason I offer it is because, when the Legislature asks an opinion of the supreme court that they may have the advice of the supreme court, the highest judicial power of the State, so that they may not make so many mistakes. It has worked well in Massachusetts, Maine, and our sister state, Colorado. I think it is a good provision, and I think we ought to adopt it.
> Mr. EICHNOR. Mr. Chairman, I hope that the section will not be adopted. If the supreme court as a body or individual judges should give their opinion to the governor, senate, or lower house, or all combined, and then if a case arises out of the matter, on which they give an opinion, the man can win the case, no matter if they were in the wrong. I think the supreme court should not act as attorneys.
> Mr. MALONEY. It is for the Legislature to legislate. They may want an opinion. They may ask the supreme court to give an opinion on an act, it does not apply to any such instances as the gentleman speaks of.
> Mr. EICHNOR. It is an old custom that prevailed in Massachusetts, I do not know whether it has fallen into disuse there or not, but I believe it has. I think our article, in article 22, goes about as far in this matter as it should go. I think that covers the ground fully.
> The proposed section was rejected.

6. *See generally* Mel A. Topf, *The Jurisprudence of the Advisory Opinion Process in Rhode Island*, 2 ROGER WILLIAMS U.L.REV. 207, 213 (1997).

7. *See, e.g.,* COLO. CONST. art. VI, § 3 (1876); FLA CONST. art. V, § 16 (1868); MASS. CONST. pt. II, ch. 3, art. 2 (1780); N.H. CONST. pt. II, art. LXXIV (1784); R.I. CONST. art. X, § 3 (1842); S.D. CONST. art. V, § 5 (1889).

8. *See In re Advisory Opinion*, 335 S.E.2d 890, 891–92 (N.C.1985) (recognizing that, "from time to time as a matter of courtesy, and out of respect to a coordinate branch of the government, individual members of the Court acting in their individual capacities have given [advisory] opinions," but abandoning the practice due to practical and separation of powers and concerns (internal quotation marks omitted)).

9. *Reply of the Judges of the Supreme Court to the Gen. Assembly*, 33 Conn. 586 (1867) (abandoning the traditional practice of issuing advisory opinions).

tions,[10] or omitted such a provision from a later version of their constitution [11] (not to mention those states that disdained the practice from the outset). Thus, the Utah framers' conscious rejection of this practice speaks volumes. It confirms that whatever else the judicial power clause may imply, it incorporates a prohibition on the issuance of advisory opinions by our courts.

 ¶ 24 This prohibition likewise implies a constitutional basis for the doctrine of mootness. The defining feature of a moot controversy is the lack of capacity for the court to order a remedy that will have a meaningful impact on the practical positions of the parties. When a case is moot in this sense, the parties' interest in its resolution is purely academic.[12] Their stake is parallel to that of a party seeking an advisory opinion. Such an opinion, accordingly, is beyond the scope of the judicial power,[13] and we have no inherent discretion to disregard the limits of that power at the behest of parties who insist on the precedential importance or practical significance of our doing so.[14]

¶ 25 The notion of such discretion is repugnant to the very idea of a written constitution. That document protects us by setting forth fundamental limitations on government authority that cannot be crossed or disregarded as a matter of convenience or discretion. We accept that principle as established orthodoxy on matters of individual rights such as that of free speech or double jeopardy.[15] But it is no less viable on matters defining the structural scope of the powers of the branches of government.

 ¶ 26 Indeed, on matters affecting the scope of our own power or jurisdiction, our duty to vigilantly follow the strictures of the constitution is a matter of great significance.[16] Courts have a sua sponte obligation to carefully consider the propriety of their own jurisdiction.[17] And rightly so. Since at

10. *In re Application of the Senate*, 10 Minn. 78 (1865) (concluding that advisory opinions were unconstitutional); *State v. Baughman*, 38 Ohio St. 455, 459–60 (1882) (same).

11. *See* Topf, *supra* note 6, at 213–14 (noting that Missouri's "advisory opinion provision in its 1865 constitution was omitted in its 1875 constitution").

12. *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 81 L.Ed. 617 (1937) ("A justiciable controversy is ... distinguished from ... one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." (citations omitted)).

13. *See* James B. Thayer, *The Origin and Scope of the American Doctrine of Constitutional Law*, 7 Harv. L.Rev. 129, 153 (1893) ("[T]he giving of advisory opinions ... is not the exercise of the judicial function at all, and the opinions thus given have not the quality of judicial authority.").

14. Our decisions on certified questions are not to the contrary. *See* Utah R.App. P. 41. The Utah Constitution expressly confers jurisdiction in such matters. Utah Const art. VIII, § 3. And guidance we provide in answering certified questions is parallel to the guidance we offer on matters necessary to resolution of the case on remand. *See* Utah R.App. P. 30. In both of those

circumstances, our opinions are not advisory in the sense of dealing with hypothetical or since-extinguished controversies. They are addressed to questions that are squarely presented by a live case and that affect the rights or remedies available to the parties.

15. *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts[,] ... [including the] right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights.").

16. *Baird v. State*, 574 P.2d 713, 716 (Utah 1978) ("Judicial adherence to the doctrine of separation of powers preserves the courts for the decision of issues between litigants capable of effective determination." (internal quotation marks omitted)); *see also Carter v. Lehi City*, 2012 UT 2, ¶ 93, 269 P.3d 141 (observing that ripeness doctrine "prevents the court from intruding on legislative functions by unnecessarily ruling on sensitive constitutional questions").

17. *Kennedy v. New Era Indus., Inc.*, 600 P.2d 534, 534–35, 537 (Utah 1979) ("Although the issue of jurisdiction was not raised by either party, it is our prerogative, [s]ua sponte, to refuse to decide cases not properly before the Court ... so that the proper relationship between this Court and the trial courts may be maintained.");

least *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), courts have been entrusted with the overarching power of judicial review, and that power vests in us the final word on the interpretation and application of the constitution. When we are asked to employ that sweeping authority in a manner defining our own power, we must do so with particular care and all humility.

¶ 27 We must not allow ourselves to be lightly "persuaded by reasons of expediency to engage in the business of giving legal advice," as doing so will inevitably "chip away a part of the foundation of our independence and our strength." *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.,* 438 U.S. 59, 103, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (Stevens, J., concurring). We accordingly decline the parties' request that we deem the doctrine of mootness a mere matter of convenience or judicial discretion. Mootness is a constitutional principle, not a matter left to our discretion to decide which cases should be spun out and which cut off based on some vague sense of fairness or importance of the issue.

### B

¶ 28 The parties' fallback position is more firmly rooted in our case law. They argue, in the alternative, that the doctrine of mootness defined in our cases is subject to an exception implicated here. Both parties acknowledge an exception and both refer to it as a "public interest exception." But they disagree as to its elements. The Union identifies only one element of this exception. UTA refers to three. We accept UTA's formulation, but proceed to conclude that the exception in our cases is not satisfied here.

*see also Mansfield, C. & L.M. Ry. Co. v. Swan,* 111 U.S. 379, 382, 384, 4 S.Ct. 510, 28 L.Ed. 462 (1884) ("[T]he rule, springing from the nature and limits of the judicial power ... is inflexible and without exception which requires this court, of its own motion, to deny its own jurisdiction ... in all cases where such jurisdiction does not affirmatively appear in the record on which, in the exercise of that power, it is called to act .... upon the principle that the judicial power ... must not be exerted in a case to which it does not extend, even if both parties desire to have it exerted.").

¶ 29 The Union characterizes the exception recognized in our case law as consisting of a single requirement, which is satisfied whenever a question presented involves a "sufficient public interest." This single element purportedly is rooted in language in our opinions intimating that matters "of wide concern" or "affect[ing] the public interest" may qualify for an exception to the doctrine of mootness. *See Wickham v. Fisher,* 629 P.2d 896, 899 (Utah 1981); *In re Adoption of L.O.,* 2012 UT 23, ¶ 9, 282 P.3d 977. And because the Union views the matters resolved in the district court to be of significance to Utah's citizens, it claims to meet the standard for a "public interest" exception to mootness.

¶ 30 UTA, on the other hand, identifies three conjunctive elements of the exception in our case law, requiring an issue that (1) affects the public interest, (2) is likely to recur, *and* (3) because of the brief time that one litigant is affected, is capable of evading review.

¶ 31 We agree with UTA and endorse and reaffirm this three-part formulation. The Union's standard misconceives the "public interest" notion in our opinions. We have never recognized a "public interest exception" *per se*—in the sense of holding that matters of significance or interest to the public may be heard by the court despite being presented in a moot controversy without any other showing. Nor could we, as the discussion in part II.A above establishes the constitutional foundations of mootness and, thus, the bar to our resolving to exercise our discretion to hear cases that are moot but of great public interest.[18]

18. Thus, to the extent any of our older decisions include stray dicta suggesting that a "public interest exception" might be satisfied by showing only that a matter involved the public interest, those decisions are in error. *See, e.g., McRae v. Jackson,* 526 P.2d 1190, 1191 (Utah 1974) (referring to the "public interest" exception in terms that might be construed as requiring nothing more than a showing that a matter involved the public interest). Our recent opinions make clear that this exception has three conjunctive elements. *See infra* ¶ 32 n.19.

¶ 32 The "public interest" references in our cases refer to the three-part exception to the mootness doctrine advanced by UTA (addressed in part II.B.2 below). Thus, our cases simply establish that a matter that appears moot may nonetheless be decided by the court if it (1) presents an issue that affects the public interest, (2) is likely to recur, and (3) because of the brief time that any one litigant is affected, evades review. *In re Adoption of L.O.*, 2012 UT 23, ¶ 9, 282 P.3d 977.[19]

¶ 33 We accordingly reject the Union's invitation to adopt and apply a standalone "public interest exception" to the mootness doctrine. This label, in fact, seems more confusing than helpful, as it implies some controlling significance in the public interest in the question presented for review. Thus, going forward, we will instead refer simply to the notion of an "exception" to the mootness doctrine—an exception that in our cases requires not just a question affecting the public interest but also (conjunctively) a likelihood of recurrence and evasion of review.

### 2

¶ 34 The exception to the mootness bar is not satisfied here. Even assuming that the "public interest" requirement of the exception is satisfied, the parties have failed to demonstrate the satisfaction of the exception's other two requirements.

¶ 35 First, the parties are unable to satisfy the exception's "likely to recur" requirement. UTA and the Union speculate that the same kind of negotiation impasse and unilateral action that led to the litigation in the district court could recur at some point in the future. Their assertions on this point, however, are entirely speculative and lack any support in the record. In fact, when this question came up at oral argument in this case, counsel for UTA acknowledged that in the decade that he had represented the transit authority, this was the first time he had encountered such a dispute and was unable to offer any non-speculative ground for indicating whether or when it might happen again.

¶ 36 This showing falls far short of that necessary to qualify as a matter capable of repetition. Under settled case law, "a mere physical or theoretical possibility" of recurrence is insufficient. *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982). "[T]here must be a reasonable expectation or a demonstrated probability that the same controversy will recur." *Id.* (internal quotation marks omitted). No such showing has been made here.

¶ 37 Nor have the parties shown that the matter is so discrete or rapidly resolving as to be "capable of evading review." "The types of issues likely to evade review are those that are inherently short in duration so that by the time the issue is appealed, a court is no longer in a position to provide a remedy." *In re Adoption of L.O.*, 2012 UT 23, ¶ 10, 282 P.3d 977 (internal quotation marks omitted). We have found such rapidly resolving issues in election matters,[20] closed political meetings,[21] bar admissions,[22] and abortion cases.[23]

---

19. This three-part, conjunctive test is well established in our case law. *See McBride v. Utah State Bar*, 2010 UT 60, ¶ 13, 242 P.3d 769 (setting forth the three elements of the exception); *Ellis v. Swensen*, 2000 UT 101, ¶ 26, 16 P.3d 1233 (same); *Burkett v. Schwendiman*, 773 P.2d 42, 44 (Utah 1989) (same); *Wickham v. Fisher*, 629 P.2d 896, 899 (Utah 1981) (same); *see also Kehl v. Schwendiman*, 735 P.2d 413, 415 (Utah Ct.App. 1987) (same).

20. *See Ellis*, 2000 UT 101, ¶ 27, 16 P.3d 1233 (holding that a violation of the election code is likely to evade review because the election would always be over before the violation could be litigated).

21. *See Kearns–Tribune Corp. v. Salt Lake Cnty. Comm'n*, 2001 UT 55, ¶¶ 32–33, 28 P.3d 686 (holding that a closed meeting in violation of the Public Meetings Act was a matter that would evade review because public officials were likely to publish the notes from the closed portion of the meeting before the matter was litigated).

22. *See McBride*, 2010 UT 60, ¶ 15, 242 P.3d 769 (concluding that since the bar exam is offered every six months a challenge to the bar's examination procedures was capable of escaping review "[b]ecause it [wa]s highly unlikely, if not impossible, that a claim such as this could be litigated from start to finish in a six month period of time").

23. *McRae*, 526 P.2d at 1191 (recognizing and citing *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), for the proposition that

¶ 38 The matter before us is not of that ilk. Although the negotiations in *this* case resolved the dispute before an appeal could be fully developed and decided, that result is a function of the parties' actions in light of an arbitration ruling, not some matter of "inherently short" duration. Moreover, the parties actually obtained a judgment from the district court, indicating that this is not one of those discrete issues that will most often be resolved before a court can address the conflict.

¶ 39 While this case may involve the public interest, it is no more capable of repetition but evading review than any of a broad range of garden-variety disputes, almost all of which *could* be resolved before the matter is resolved on appeal. If we recognized an exception here, it would be the exception that swallowed the rule. That we refuse to do. We accordingly hold that this case does not qualify for an exception to the doctrine of mootness.

¶ 40 Courts in Utah lack the power to issue advisory opinions or resolve moot cases. Because this matter is moot and does not satisfy the exception to the mootness bar recognized in our cases, we cannot take it up. We accordingly dismiss it.

Justice LEE, authored the opinion of the Court, in which Chief Justice DURRANT, Associate Chief Justice NEHRING, Justice PARRISH, and Justice DURHAM joined.

("even if the matter had become moot because of the termination of plaintiff's pregnancy, nevertheless, the court would retain jurisdiction of the appeal because there was an issue capable of repetition, yet evading review") (internal quotation marks omitted)).