Justice LEE,
concurring in part and dissenting in part:
€63 In the past several decades, this court's standing jurisprudence has strayed *1119 further and further from its traditional mooring in the judicial power clause of the Utah Constitution. Thus, although we have long recognized a "traditional" conception of standing requiring individualized injuries sustaining private rights of action, our more recent decisions have exhibited increasing willingness to overlook that requirement under a "public interest" exception. That exception, as reconceived by the court today, stretches the principle of standing beyond recognition.
T 64 I respectfully dissent from the majority's invocation-and extension-of this "public interest" exception to the traditional requirement of standing. Its methodology is incompatible with the judicial power clause in Article VIII of the Utah Constitution. That clause limits our authority to the resolution of cases that fall within the traditional conception of the judicial power. In overriding these constraints, the majority robs the constitutional limits on our power of meaningful content. It does so to uphold standing for the Article VI claimants in this case on public interest grounds, thereby subjecting the standing inquiry to the arbitrary discretion of the court, under a standardless "test" that is little more than a post-hoc justification for a preferred result. Under this test, the standing question is left to a subjective, case-by-case assessment of a majority of the court as to whether the .claims seem sufficiently "important" to merit review.
T 65 Instead of expanding the public interest exception, I would repudiate our prior dicta on this point and reject the exception altogether. And I would resolve the case under a traditional formulation of standing-one requiring an assertion of injury sustaining a private action. That formulation, in my view, requires dismissal of all of the claims at issue in this case, including the Article VI claims the majority reaches on public interest grounds.
I. STANDING AS A CONSTITUTIONAL COMPONENT OF THE JUDICIAL POWER
T 66 Standing is not a judge-made principle of judicial restraint subject to common-law evolution over time. It is an essential element of the constitutional provisions defining and limiting the judicial power. Such an element requires careful definition, rooted in an interpretation of the binding text of our constitution. We assail the very principle of constitutionalism when we ignore that interpretive role and opt instead to invoke and refine standardless "exceptions" justifying (but failing to explain) our case-by-case preferences to exercise jurisdiction in some cases but not in others.
T 67 We recently underscored these central points in the parallel context of our mootness doctrine. In Utah Transit Authority v. Local 382 of the Amalgamated Transit Union, 2012 UT 75, 289 P.3d 582, we repudiated a freestanding,[1] discretionary "public interest" exception to the doctrine of mootness, explaining that mootness is an essential "element of the principles defining the seope of the "Judicial power' vested in the courts by the Utah Constitution," not a "simple matter of judicial convenience or ascetic act of discretion." Id. 118. After identifying the historical basis for foreclosing the use of judicial power to issue advisory opinions, our opinion in Utah Transit Authority chided the parties for urging our invocation of standardless "discretion" to exercise judicial power withheld by traditional constitutional bounds, noting:
The notion of such discretion is repugnant to the very idea of a written constitution. That document protects us by setting forth fundamental limitations on government authority that cannot be crossed or *1120 disregarded as a matter of convenience or discretion. We accept that principle as established orthodoxy on matters of individual rights such as that of free speech or double jeopardy. But it is no less viable on matters defining the structural seope of the powers of the branches of government.
Id. I 25 (citation omitted).
168 Our Utah Transit Authority opinion also clarified the appropriate methodology for interpreting the constitutional limits on our judicial power. While recognizing that the text of Article VIII's articulation of "[t]he judicial power of the state" does not "reveal the precise seope" of our power, we emphasized "one fundamental point": "The seope of our authority is not a matter for the courts to define at our preference or whim; we are constitutionally limited to wield only "judicial power and may not act extra-judicially (regardless of how interesting or important the matter presented for our consideration)." Id. 120 (alteration in original) (internal quotation marks omitted); see also Mellor v. Wasatch Crest Mut. Ins., 2012 UT 24, ¶ 14, 282 P.3d 981 ("The limits on our jurisdiction are legal rules that define the nature and extent of the judicial power, not mere guidelines to be invoked or discarded at our whim."). And to give content to the text of the constitution, we turned to the traditional understanding of the judicial power, identifying long-established case law and constitutional history that informed the mootness doctrine's limitations on the judicial power.[2] Utah Transit Auth., 2012 UT 75, ¶¶ 21-24, 289 P.3d 582.
T 69 As set forth in detail below, an inquiry in this case following the model set out in Utah Transit Authority reveals that standing, like mootness, places well-defined, principled limitations on the scope of Article VIII's grant of judicial powers.[3] So, although our constitution does not limit our authority (as the federal constitution does) to the resolution of a "case or controversy," see supra T12 (noting this discrepancy), the lack of such restriction is hardly a carte blanche license to reach out to exercise any power we deem expedient.[4] The separation-of-powers *1121 limits on our authority are too important to be subsumed into a standardless evaluation of the significance of a party's underlying claims. If a party's standing turns on such an evaluation, our interpretation of the scope of our power will not be taken seriously, and we will leave ourselves open to the impression (if not the reality) of arbitrariness.
{70 Thus, I cannot accept the "public interest" test invoked by the court. I would instead interpret Article VIII of our constitution to confine the authority of the Utah courts to hear cases filed by private plaintiffs only where they vindicate "private rights," as that term was historically understood at the time of the framing of the Utah Constitution. That standard requires dismissal of all claims in this case for lack of standing.
{71 In the sections that follow, I set forth the historical basis for the standard I would adopt, show that this standard is compatible with most all of the holdings (but not some of the dicta) from our court on the law of standing, and explain why the citizen-plaintiffs in this case lack standing.
IL THE TRADITIONAL CONCEPTION OF STANDING
T72 Under the framework employed in Utah Transit Authority, we must take seriously our role of interpreting the judicial power clause of Article VIII. And in interpreting that clause, we must examine the traditional understanding of the judicial power, identifying limits on the judicial power in established case law and in our constitutional history. If the traditional standing requirement is rooted in the constitution, it cannot be seen as a mere salutary invention of this court or as a matter within our power to "relieve" a plaintiff of fulfilling. See supra 113.[5] Instead, it must be understood as a constraint on the exercise of judicial power that we are duty-bound to follow-just as we are with any provision of the constitution-unless and until the people repeal or amend the terms of Article VIII. As detailed below, I would find that the standing limits on our judicial power are indeed constitutionally rooted. This conclusion necessarily forecloses the majority's approach-of announce-ing an evolving set of discretionary standards endorsing claimants we deem "appropriate" or claims we find within the "public interest."
1 73 The starting point for this analysis, of course, is the text of Article VIII. That provision confers on our courts the "judicial power," and it speaks of our authority to issue "writs" and to decide "cases." Uran Const. art. VIII, §§ 1, 3, 5. These are definite terms with fixed content that place meaningful restrictions on the exercise of judicial power. First, because the power we wield must be "judicial," we are foreclosed from making law or announcing our views in an advisory or other non-judicial posture. Seq, e.g., Utah Transit Auth. v. Local 382 of the Amalgamated Transit Union, 2012 UT 75, ¶ 23, 289 P.3d 582.[6] And second, our exercise *1122 of the judicial power must be in the context of the issuance of "writs" or in our resolution of "cases," a formulation that implies a particular form for exercising the judicial power.[7]
174 Our interpretation of Article VIII, then, must be informed by an analysis of the traditional nature of the judicial power and of the types of writs and cases traditionally resolved in the courts. And in my view, the relevant history is clear. Established case law in Utah and elsewhere has long limited the judicial power to the resolution of suits brought by private parties in cases involving so-called "private rights."
175 Eighteenth- and nineteenth-century precedent established important limitations on the sorts of writs and cases that could be initiated by private parties and entertained by courts. The traditional formulation in the case law uniformly held that suits involving "public rights"-interests held by the public generally and not by individuals-could not be initiated by private plaintiffs.[8] Specifically, in actions involving eriminal prosecutions, public nuisances, and writs of mandamus, the courts held that private individuals could not maintain actions vindicating public rights. For me, these cases establish a key element of the doctrine of standing as a gateway to the invocation of the judicial power: Private parties lack standing to sue to vindicate public rights, which must be asserted by government representatives and not by private individuals.[9]
A. The Criminal Law Example
T 76 Since before the founding of the Utah Constitution, it has been widely "understood [that] the tort action [is] under private control and the criminal action [is] under public control." Ann Woolhandler & Caleb Nelson, Does History Defeat Standing Doctrine?, 102 *1123 Micx. L. Rev. 689, 696 (2004). Early American courts uniformly proscribed the private prosecution of criminal actions. Id. at 696-700.[10] Concerns about giving private parties control over claims belonging to the general public drove this proscription. See Foute v. State, 4 Tenn. 98, 98-99 (1816). Courts feared that "leaving prosecutions to every attorney who will take a fee to prosecute" would frustrate "[the designs of the constitution" and permit "the innocent to be oppressed or vexatiously harassed" without "the responsibility imposed by the oath of the solicitor-general[,] by his selection for the discharge of these duties, [and] by the confidence of the public reposed in him." Id. at 99-100; see Markham v. Close, 2 La. 581, 587 (1831) (worrying that private prosecutions would reflect "the promptings of envy, malice, and all uncharitableness"). Thus, as the U.S. Supreme Court put it in 1842, "from the very nature of an indictment, and the sentence thereon, the government alone has the right to control the whole proceedings and execution of the sentence." United States v. Murphy, 41 U.S. (16 Pet.) 203, 209, 10 L.Ed. 937 (1842).
177 Early Utah eriminal law followed this pattern and confirms that actions by individuals to prosecute public wrongs are not within the judicial power. Utah courts carefully differentiated between the individual-specific harm typical to civil cases and the society-level harm involved in criminal matters. See Snow v. Snow, 13 Utah 15, 43 P. 620, 622 (1896) (though a private party may benefit from a criminal contempt charge, it is imposed "to vindicate the authority and dignity of the people, as represented in and by their judicial tribunals"). Criminal process was appropriate for the latter, but not for the former. As one early opinion put it, "[erimi-nal] punishment is not meted out as a 'balm to hurt mind.. Nor is there in the law aught of malice against him who is punished. The power is exercised by the court as the representative, in this respect, of the people,-the ultimate sovereigns-and in their interest and for their good." In re Whitmore, 9 Utah 441, 35 P. 524, 528-29 (1894) (internal quotation marks omitted). Thus, territorial erimi-nal statutes required "the prosecuting attorney, or other counsel for the people, [to] open the cause, and offer the evidence in support of the indictment." Territory v. Catton, 5 Utah 451, 16 P. 902, 908 (1888) (quoting Crim. Cope Laws Uran § 2572), (5), (6) (1878)), rev'd on other grounds by Calton v. Utah, 130 U.S. 83, 9 S.Ct. 435, 32 L.Ed. 870 (1889). Though courts allowed private counsel to aid public prosecutors during trial, People v. Tidwell, 4 Utah 506, 12 P. 61, 64 (1886), I can find no instance of a private party indicting or trying a criminal suspect independent of state involvement. This is just the first of several indications that in the era of the founding of the Utah Constitution, the judicial power was understood to restrict the vindication of public rights to public officials-and to do so on the basis of a concern about the capacity of private litigants to account for the public weal and without regard to the importance of the issue involved.
B. Nuisance Law
178 This limitation was not confined to criminal prosecutions, however. Under the law of "public nuisance," for example, early American courts enforced the familiar principle that "[the public authorities alone can complain of nuisances, while they remain public or general." Seeley v. Bishop, 19 Conn. 128, 135 (1848).[11] And this rule was rooted in a broader principle: "Upon general principles, that common interest, which belongs equally to all, and in which the parties suing have no special or peculiar property, will not maintain a suit." Barr v. Stevens, 4 Ky. (1 Bibb.) 292, 293 (1808).
179 Again, moreover, the proscription of private prosecution of public rights was jus *1124 tified by concerns about private parties' incapacity to account for broader societal interests. Thus, common-law commentators noted the need for "avoiding multiplicity of suits[12] and of limiting defendants' exposure to a single proceeding filed by public authorities rather than allowing "every subject in the kingdome ... to harass the offender with separate actions." [13]
{80 Though the public nuisance rule was subject to an exception, the exception itself only confirmed the public-/private-rights distinction. It held that a public nuisance action could be maintained where the nuisance resulted in "special damage" to the plaintiff-"an injury different in kind from that of which the public complains." [14] The law in this area was settled at the time of the founding of the Utah Constitution. As William Hale put it in a treatise penned at about the time our Utah framers established our founding document,
[tlhe interest which an individual has in common with all other citizens or members of the state or municipality is insufficient to authorize him to maintain an action founded upon a public wrong affecting the people at large in the same manner. A party cannot vindicate the rights of others by process in his own name, nor employ civil process to punish wrongs to the public.
William B. Hale, Parties to Actions, in 15 EncyctorEDIA OF PLEADING AND PRACTICE 456, 472-78 (William M. McKinney ed., N.Y., Edward Thompson Co. 1899) (footnote omitted).
81 Utah's early nuisance law is identical, in that it held that "private individuals ... [could] not champion purely public rights." Lewis v. Pingree Nat'l Bank, 47 Utah 35, 151 P. 558, 561 (1915). Our early cases indicate that "[nlo doubt the rule is well established that private persons may not invoke the aid of the courts to abate public nuisances, unless they can show that they suffer some special or peculiar injury or damage which is not common to the rest of the community." Id.; Startup v. Harmon, 59 Utah 329, 203 P. 637, 640 (1921) (same). Not only was the plaintiff required to show special injury, but that injury was also required to be "different not merely in degree but in kind from that suffered by the public at large." Muir v. Kay, 66 Utah 550, 244 P. 901, 905 (1925) (internal quotation marks omitted). If a different rule obtained, "a discharge in one case would be no bar to another, and thus there would be no end to litigation." Id. This precedent thus illustrates that, at and near the founding of the Utah Constitution, suits brought by private individuals to redress public wrongs were not the kind of "cases" subject to the judicial power.
C. Mandamus
182 Early mandamus actions in other jurisdictions conform with this understanding. The general rule was consistent with the practice of reserving "public" claims for public officials and allowing private suits only for special, individualized injuries. Chief Justice Lemuel Shaw articulated this principle as the law in Massachusetts: "[A] private individual can apply for a writ of mandamus only in a case where he has some private or particular interest to be sub-served, or some particular right to be pursued or protected by the aid of this process, independent of that which he holds in common with the public at large; and it is for the public officers exclusively to apply, where public rights are to be subserved." In re *1125 Wellington, 33 Mass. (16 Pick.) 87, 105 (1834).
1 83 Utah's judicial ancestry is in line with the approach prescribed by Chief Justice Shaw and squarely supports the limitation on our power overridden by the majority today. Specifically, Utah's early mandamus cases required plaintiffs to show that they had "some peculiar interest separate and distinct from that of the community in general." Startup, 208 P. at 640. Only then could the plaintiff satisfy Utah statutory law allowing mandamus to issue for "part[ies] beneficially interested." See Crockett v. Bd. of Educ., 58 Utah 303, 199 P. 158, 159-61 (1921). In Crockett, this court noted that "there are no fixed rules for determining" who is a beneficially interested party, but also confirmed that
[alll agree ... that mandamus proceedings should not be upheld on the part of an individual who, under the guise of correcting official delinquencies, uses the writ merely as a means of vexing and annoying public officials when he has no special or peculiar interest, as distinguished from that of the general community.
Id. at 160. With this in mind, the court in Crockett granted a taxpayer's writ to compel a school board to publish statutorily required annual financial statements because the statute involved "was designed for the benefit and interests of the citizen taxpayers so that they [could] be informed as to whether or not the financial affairs of the school district each year have been properly and lawfully conducted on the part of the board of education." Id. at 159-60.
184 In Startup, by contrast, the court rejected the standing of a taxpayer who sought to command a county to satisfy a statutory duty to provide funds to support widowed mothers. 208 P. at 638. The court's opinion in Startup analyzed the standing of a mandamus petitioner in a manner consistent with public nuisance standing: "If the nuisance affects him only in the same manner and to the same extent that it affects the people of the community in general, it is an elementary rule of practice that he would have no standing as a plaintiff in such proceeding. If, however, he is peculiarly affected or injured by the nuisance, then, under all the authorities, he has the right to institute an action in his own name to abate the nuisance." Id. at 640.
1] 85 Applying these principles, the Startup court dismissed the petitioner's claim for lack of standing because the petitioner was not part of the class protected or benefited by the statute (widowed mothers), but was instead a member of "the community in general" who "hald] no greater interest than any other resident." Id. at 640-41. Distinguishing Crockett, the court reiterated that the petitioner in that case had "come within the class of persons ... specially interested in the relief applied for"-residents of a particular school district, Id. at 641. At the same time, the court doubted that standing would have been found in Crockett had the taxpayer not been such a resident. Id. In such case, the Crockett taxpayer would have been similar to the Startup petitioner-no more than "interested as a citizen in seeing that the law was enforced." See id.
186 Seeing "no reason" in law to sustain standing by a citizen merely interested in assuring the enforcement of the law, the court rejected the Startup petitioner's standing. Id. In so doing, the court noted that "[alny widowed mother of the class mentioned, for whose relief the law was enacted, would undoubtedly have the right to apply for a writ of mandate to compel an enforcement of the law," and that "[alny attorney authorized to represent the county ... would have the right ... to institute [al proceeding." Id. But a "person whose relation to the case" is merely that of a citizen seeking enforcement of the law could not be sustained without "set[ting] at naught" the rules of standing in mandamus.[15] Id.
*1126 D. The Root of Standing Doctrine
87 This historical practice of differentiating between public and private rights is fundamental. The above-cited cases distinguishing private and public rights represent not just a traditional policy preference for public control over public actions, but a principle long understood to define and establish limits on the judicial power.
1 88 Prohibiting private parties from vindicating grievances shared by the general community plays an important role in maintaining the separation of powers.[16] Thus, in the era leading up to the founding of the Utah Constitution, American courts widely accepted the public-/private-rights distinction as an element of "standing" or a limit on the gateway to the judicial power.[17] Respect for that principle is essential to honoring constitutional limits on the powers of the judicial branch of government.
189 When we exceed our constitutional authority, we necessarily tread on ground that belongs to a coordinate branch of government. As we noted in Jenkins v. Swan, "[the requirement that a plaintiff have a personal stake in the outcome of a dispute is intended to confine the courts to a role consistent with the separation of powers, and to limit the jurisdiction of the courts to those disputes which are most efficiently and effectively resolved through the judicial process." 675 P.2d 1145, 1149 (Utah 1983). And as we explained in Baird v. State, "Itlo grant standing to a litigant, who cannot distinguish himself from all citizens, would be a significant inroad on the representative form of government, and cast the courts in the role of supervising the coordinate branches of government." 574 P.2d 718, 717 (Utah 1978).
190 When a dispute implicates commonly held public rights, the prerogative to advocate that interest belongs to the body politic generally, not to private individuals And the advocacy of such public rights belongs either to government representatives suing for the public in court, or to the representative branches of government. As we put it in Jenkins v. Swan, "the airing of generalized grievances and the vindication of public rights are properly addressed to the legislature, a forum where freewheeling debate on broad issues of public policy is in order." 675 P.2d at 1149-50.
1[ 91 We cannot simultaneously honor these fundamental restraints on our power while defining that power through ad hoc, discretionary standards rooted in our sense of the *1127 "importance" of or "public interest" in the issues presented. See Utah Transit Auth., 2012 UT 75, ¶¶ 17, 32 & n.18, 289 P.3d 582 (rejecting freestanding "public interest" exception to the mootness doctrine; noting that the doctrine is not a "principle of our own creation" which we may "abolish ... at our whim, on the ground ... that the question presented is sufficiently important or interesting to merit our attention).[18] These are not legal restraints on our power. They are a hollow assurance that we will exercise it only where we think it is expedient to do so. That is troubling, as it threatens to blur the lines of standing with our views on the underlying merits.
1 92 We should repudiate the public interest approach and reiterate and clarify the traditional formulation of the doctrine of standing. We should decide this case in accordance with that traditional formulation.
III. PUBLIC INTEREST STANDING IN UTAH CASES
£93 Our modern standing cases do not foreclose the approach I advocate; they leave plenty of room for faithful adherence to the traditional standing formulation. Prior to today's decision, our cases have only occasionally adverted to a "public interest" notion of standing, and almost always in dicta (as an alternative to traditional standing). Today the court crosses a significant, problematic line. It extends the dicta in our cases to a square holding, and does so in a manner that deprives the limits of the public interest exception of any meaningful content.
A. The Private Right Limitation in Our Law
{ 94 The holdings in most of our cases (if not always the dicta) have effectively maintained traditional limitations on standing. In Jenkins v. Swan, for example, we foreclosed standing in cases where "other potential plaintiffs with a more direct interest in [the] particular question" exist, 675 P.2d 1145, 1151 (Utah 1988). This holding appropriately prefers parties that meet traditional standing requirements. See id. at 1150 ("[This Court will not readily relieve a plaintiff of the . requirement of showing a real and personal interest in the dispute."); York v. Unqualified Wash. Cnty. Elected Officials, 714 P.2d 679, 680 (Utah 1986) (per curiam).
195 We departed from that approach to some extent in Utah Chapter of the Sierra Club v. Utah Air Quality Board, 2006 UT 74, 148 P.3d 960, where we outlined the parameters of an expanded "public right" standing. But that discussion was dicta and not controlling. Because the plaintiff satisfied traditional standing requirements, the court did not need to opine about an alternative (public right) standing test. See id. 182.[19]
196 To my knowledge, we have only once employed the Sterrq Club dicta in a case where we found traditional standing lacking: in City of Grantsville v. Redevelopment Agency of Tooele City, 2010 UT 38, ¶ 16, 233 P.3d 461. In that case, we upheld a municipality's "alternative" standing to litigate a contract matter involving a claim for breach of a development agreement. Id. Yet although the City of Grantsville opinion upholds Grantsville City's standing on public interest grounds, id., that conclusion was again unnecessary. The city, after all, was a signatory to the agreement with an express right to receive proceeds of the development, and as such it was unquestionably a third- *1128 party beneficiary [20] with a traditional, private-right interest in the contract dispute.[21] See id. 1% 4, 6.
197 In City of Grantsville the court claimed not to reach the third-party benefi-clary basis for standing. See id. 114 & n.2 (acknowledging that third-party beneficiaries have traditional standing to sue under a contract, but concluding not to "address this issue" because Grantsville City "does not argue it"). But in my view the court necessarily (if implicitly) relied on this ground, as Grantsville City's third-party beneficiary status is the only plausible legal basis for its standing.
{98 For one thing, the City's failure to cite a third-party beneficiary basis for its standing could not have been dispositive. Standing is jurisdictional and is thus a matter the court has an obligation to consider sua sponte. Utah Transit Auth. v. Local 382 of the Amalgamated Transit Union, 2012 UT 75, ¶ 26 & n.17, 289 P.3d 582. And once we determine to reach an issue, we can hardly be required to blind ourselves from considering authority of relevance to its resolution.[22] So we were not at all foreclosed from relying on the city's third-party beneficiary status in upholding its standing.
199 And in my view the court must have relied on that status in its decision. A complete stranger to a contract would never be granted standing to sue to enforce it. See Hooban v. Unicity Int'l, Inc., 2012 UT 40, ¶ 24, 285 P.3d 766 ("[Plaintiff] was deemed a stranger to the contract, and as such he had no rights to enforce it or obligations under it."). And the enforeement of a mere contract is not a matter of fundamental public importance; surely it is less so than the constitutional claims under Article X deemed insufficient by the majority today. See supra 185. So even the City of Grantsville opinion is not really authority for public interest standing generally (and certainly not public interest standing in contract actions brought by third parties); it is better viewed as endorsing the standing of a named third-party beneficiary who failed to press a third-party beneficiary argument.
{100 This case is thus a significant milestone. It marks the first time the court has endorsed a general theory of public interest standing in a square holding. That holding is problematic on many levels. In addition to ignoring the traditional limits on our authority under Article VIII, the public interest exception undermines at least two strands of our case law requiring a real party in interest to bring its own claims.
{101 First, rule 17 of the Utah Rules of Civil Procedure requires that "[elvery action shall be prosecuted in the name of the real party in interest." Standing overlaps with the real party in interest requirement "inasmuch as both terms are used to designate a plaintiff who possesses a sufficient interest in the action to be entitled to be heard on the merits." 6A A. WricHt Et aun, EFEpEratr PracticE amp ProcEpurE § 1542 (8d ed. 2012). Courts generally define a real party in interest as "the person who is the true owner of the right sought to be enforced." See Pillsbury Co. v. Wells Dairy, Inc., 752 N.W.2d 430, 435 (Iowa 2008) (internal quotation marks omitted). So, even if a merely "competent" or "appropriate" party could establish standing under the proposed "public interest" principle, it would have to satisfy other rules governing parties in dispute, including the requirement that it be the *1129 true owner of the right sought to be enforced.[23]
1 102 Second, we have traditionally limited a litigant's ability to assert a third party's rights. See Shelledy v. Lore, 886 P.2d 786, 789 (Utah 1992). Third-party vindication of another's rights is generally proper only if "some substantial relationship between the claimant and the third parties [exists]," if it is impossible for the rightholders to assert their own constitutional rights, and if the third parties' constitutional rights would be diluted "were the assertion of jus tertii not permitted." Id. (internal quotation marks omitted)
1 108 We have recognized these limitations for good reason. As the U.S. Supreme Court has explained, " 'courts should not adjudicate [a third party's] rights unnecessarily," as "it may be that in fact the holders of those rights ... do not wish to assert them'" and the "third parties themselves usually will be the best proponents of their own rights." Wilderness Soc. v. Kane Cnty., 632 F.3d 1162, 1171-72 (10th Cir. 2011) (second alteration in original) (quoting Singleton v. Wulff, 428 U.S. 106, 113, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)).[24] Thus, courts "should prefer to construe legal rights only when the most effective advocates of those rights are before them." Id. at 1172 (internal quotation marks omitted).
104 I dissent because I see no basis in our precedent or elsewhere for abandoning these principles. I find no comfort in the fact that the approach embraced by the majority today "is not unusual in state jurisprudence." Suproe 116. That is apparently true. But it is also beside the point if the trends in caselaw outside of Utah are incompatible with the provisions of the law that we are bound to enforce. And that is exactly how I see the authority before us..
1105 The state precedent cited by the majority rests entirely on the faulty premise of "standing" as a judge-made principle of prudential restraint. In adopting a public interest conception of standing, these state courts have routinely ignored the governing constitutional language-with the dismissive assertion that the federal "case or controversy" limitation is not a part of the state judicial power clause. See supra 116 (noting that the cited opinions are "mindful that their constitutions do not impose the same restrictions on their judicial power that the federal constitution imposes on federal courts"). For reasons I've explained above, the conclusion (of unbridled, common-law power) does not at all follow from the premise (the lack of a "case or controversy" clause). Thus, the court may find persuasive the notion of standing in state court as " 'a self-imposed rule of restraint " or a " "judge-made doetrine'" that " 'free[s]' " state courts to "'reject procedural frustrations in favor of " their own subjective sense of what is a "'just and expeditious.'" Supre 116 n.10 (quoting 59 Am. Jur. 2p Parties § 80 (2012)). But I find them helpful only in highlighting the problematic foundation of the public interest doctrine of standing. We should reject that doctrine and instead follow the traditional formulation of standing that is deeply rooted in the holdings of our cases and in the text of Article VIII
B. The Majority's Eradication of a Meaningful "Public Interest" Standard
106 In upholding plaintiffs' standing to assert their Article VI claims in this case, the court not only invokes the "public interest" exception in a square holding; it stretches the exception in a manner that erases all meaningful limits on the doctrine of standing. The majority heralds its intent to preserve "strict standards" in a manner that "avoid[s] the temptation to apply a judge's own beliefs and philosophies to a determination of what questions are of great public importance." *1130 Supra 132 n.18 (internal quotation marks omitted). Yet the court's variation on the public interest standard eliminates any real limits, strict or otherwise, leaving the applicability of the exeeption to the court's unbridled discretion.
1107 First, in repudiating any requirement that the plaintiff be a traditional claimant with an individual injury-or even the "most appropriate party," as our prior dicta sometimes suggested [25]-the court effectively abandons any threshold limitation based on the plaintiff's stake in the outcome of the case. The court articulates this element in terms that require a determination that the plaintiff is "'an appropriate party'" Supra 1 15 (quoting Cedar Mountain Envtl., Inc. v. Tooele Cnty. ex rel. Tooele Cnty. Comm'n, 2009 UT 48, ¶ 8, 214 P.3d 95 (emphasis omitted)). But this inquiry is hardly a "test." It seems to me that it is more of a post-hoc passing grade-one crafted to justify the court's ultimate determination to reach the merits of the case.
1108 That becomes clear when the court actually applies the test. In deeming plaintiffs "appropriate," the court says nothing that couldn't be said about any litigant with the resources to hire effective counsel (and with even the most remote interest). Perhaps it's true that plaintiffs have "done an admirable job of briefing the facts and controlling law" in this case, supra 1 29, but that is no meaningful gateway to standing. Nor is the fact that the plaintiffs have "policy concerns" and are "focus[ed] on the instant constitutional challenge." Supra 129 (internal quotation marks omitted). We should require (and almost always have required) more from litigants than a showing that they are deeply worried about the case before us. Finally, the fact that plaintiffs "have caused this court to consider" the Article VI issues they have raised and to "clarify the standards they impose for the first time in decades" may ultimately be an "achievement." Supre 129.[26]But if so, it is a circular achievement of the court's own making. The fact that the court ultimately considered the issues presented cannot itself be a justification for agreeing to consider the issues. Plaintiffs have achieved standing only because we granted it to them. It is a bootstrap to commend that "achievement" as a basis for upholding standing.
{109 The court cements the cireularity of its test in its articulation of the second step of the analysis. While acknowledging the existence of plaintiffs with concrete interests in suing to challenge SB 2 (such as teachers who fail to qualify for a salary supplement under the statute or textbook publishers whose books are not approved by the statutory approval program), the court dismisses these "hypothetical" plaintiffs as irrelevant-asserting that their failure to file suit to date is enough to render "unlikely" a lawsuit by these parties. Supra 130. This is a striking-and deeply troubling-step in our public interest standing jurisprudence. Before today, the question was not whether directly affected parties had filed suit, but whether they existed. See Haymond v. Bonneville *1131 Billing & Collections, Inc., 2004 UT 27, ¶ 10, 89 P.3d 171 (denying "public interest" standing because two classes of potential plaintiffs existed that were in a better position to bring suit). If the failure of real parties in interest to file suit is enough to sustain recognition of a member of the general public to step in as an "appropriate" party, we have defined the gateway to the judicial power out of existence.[27] We have assured that the jurisdictional threshold to the Utah courts depends only our subjective determination to hear a case even absent the presence of the claimant with a traditional stake in filing it.
[ 110 Finally, the court's test is also cireu-lar in its assessment of the ultimate question of whether the Article VI claims asserted by plaintiffs are "of sufficient importance and general interest that claims of their violation may be brought even by plaintiffs who lack standing under the traditional criteria." Su-pro 127. Except to conclude that the Article VI issues are "part of the fundamental structure of legislative power articulated in our constitution," supra 127, the court offers no justification for deeming this element satisfied. And the court's further explication of the point only confirms its analytical emptiness. I see no rational, articulable basis for deeming the Article VI issues sufficiently important while rejecting the Article X issues on this score.
111 It is hardly an answer to note that "[njot every constitutional provision" is sufficiently important. Suproe 127. That only begs the question of which ones clear the bar-and of the theoretical basis for setting the bar, or the level at which it is set. In begging these questions, the court has evaluated the importance element entirely within the confines of a black box. That not only deprives the parties in this case of an understanding of the basis of the court's decision; it also withholds from lower courts the tools needed to make these determinations going forward.
{112 The hollow nature of the majority's standing analysis is confirmed by the court's ultimate rejection of public interest standing for the Article X claims. The court's proffered rationale-that the Article VI claims involve "restrictions which must be observed every time the legislature exercises its core function of passing laws" while the Article X claims involve a mere "a delegation of a defined subject to particular agency," supra T 86,-is misdirection at best. Surely abiding by the constitution's power-allocation scheme is part of the legislature's "core function" that must be considered each time a law is passed. And the majority's refusal to "conclude that such questions can mever be appropriate ones in which to employ the pub-lie-interest standing doctrine" only bears that out and emphasizes the standardless quality of this doctrine. Supre 136. Either the violation of a constitutional provision is important or it is not. Its importance cannot depend on the identity of the plaintiffs or the circumstances of each case, as the majority implies. Supra T 36.
{113 In all, the majority's distinction between the Article VI and Article X claims does not spring from meaningful analysis. It is an attempt to paper over an ultimate conclusion [28]-the court's preference for reach *1132 ing one set of claims (under Article VI) while declining to reach others (under Article X).[29]
114 The exercise of unfettered discretion is troubling, especially on a matter constituting a limit on our power under the Utah Constitution. As we explained in Utah Transit Authority, "on matters affecting the scope of our own power or jurisdiction, our duty to vigilantly follow the strictures of the constitution is a matter of great significance." 2012 UT 75, 126, 289 P.3d 582. We ignore that responsibility when we treat the constitutional limits on our power as "mere matter[s] of convenience or judicial discretion." Id. 127. And we undermine the fundamental notion of a written constitution when we adopt jurisdictional standards that show no fidelity to that document and seize unbridled "discretion to decide which cases should be spun out and which cut off based on some vague sense of fairness or importance of the issue." Id.
T 115 The public interest notion of standing cannot stand in the face of these principles. The court's extension of this doctrine here is particularly problematic, as it cements the public interest exception in a square holding, and in a manner that assures arbitrariness in its application going forward.
IV. THE TRADITIONAL STANDING TEST APPLIED HERE
{116 For all these reasons, we should reinforce the constitutional basis for our traditional conception of standing and repudiate the public interest exception as incompatible with our constitutional tradition. And we should vacate and dismiss this case for lack of standing.
{117 The Article VI claims at issue here are prototypical, generalized grievances. Plaintiffs have asserted no injury peculiar to them-no interest or stake beyond that of all Utah citizens. They are complaining about the process that resulted in the enactment of SB 2-a process allegedly lacking the clear title and single subject required by the Utah Constitution-and not an unlawful impact of the legislation on them as private individuals.
1 118 Thus, plaintiffs are not individuals or entities with a direct stake in challenging SB 2, like the affected teachers or book publishers identified by the majority. Supra 1830. They are Utah taxpayers asserting a generalized challenge to the propriety of the legislative process culminating in SB 2. Their standing cannot be upheld under our historical standing caselaw without doing serious violence to their core principle. See supra 1172-92. They lack standing on that basis, and their case should be dismissed.
*1133 {119 The Article X claims, on the other hand, do not belong to the plaintiffs who seek to litigate them. The Utah Board of Education is the real party in interest. We should not allow vaguely interested individuals to assert and litigate to protect the rights of a state body when that body has declined-for whatever reason-to take action[30] The plaintiffs have not established that the Board of Education cannot properly protect its own rights. Nor have they asserted a valid, particularized injury stemming from the condemned legislation. Thus, I would dismiss both claims because they implicate the rights of third parties who are the real parties in interest, and because the plaintiffs who seek to advance these claims cannot establish their own individual standing or satisfy the elements of the doctrine of third-party standing.
[ 120 This is not the sort of case where the plaintiffs before the court are the only kinds of parties who could conceivably litigate this kind of action. Clearly there are plaintiffs out there with a direct interest in these suits-textbook publishers, science teachers, and the State Board of Education, for example. Those plaintiffs have elected not to sue. That seems significant. We should not broaden the field of proper plaintiffs just because we wish that the directly interested parties had filed suit, or because we think the issues at stake seem important or interesting. The judicial power is confined to the resolution of disputes between the parties who have a direct stake in the outcome. The plaintiffs who filed these cases do not qualify under that rubric.
1121 The bounds of our judicial power cannot accommodate the kind of expansion that "public right" standing for merely "competent" plaintiffs involves. We cannot properly allow less than directly interested parties to litigate before us. To do so risks unrestrained decision-making based on underdeveloped facts and law and ultimately against the will and rights of those directly harmed.[31] It also risks invasion of the province of the legislature. Public dispute resolution is beyond our constitutional authority in a case filed by private plaintiffs.

. The Utah Transit Authority v. Local 382 of the Amalgamated Transit Union opinion clarified that the so-called "public interest" exception to our mootness doctrine is not a one-part inquiry that may be "satisfied by showing only that a matter involved the public interest." 2012 UT 75, 131 n.18, 289 P.3d 582. Rather, the exception requires a litigant to show that a matter "(1) presents an issue that affects the public interest, (2) is likely to recur, and (3) because of the brief time that any one litigant is affected, evades review." Id. 132. Because we deemed the notion of a "public interest exception" more confusing than helpful, we repudiated that label, reinforcing our holding that the "public interest" alone is an inadequate ground for exercising jurisdiction over a moot case. Id. 133.

. The majority seeks to undermine the import of our Utah Transit Authority opinion on grounds purportedly distinguishing mootness and standing. In the majority's view, mootness somehow concerns only a "characteristic of a dispute between the parties," while standing simply respects a "characteristic ... of the parties themselves." Supra 112 n.5. These are semantic distinctions without any analytical difference. In reality, both mootness and standing concern the interests of particular parties in a particular dispute-such that the characteristics of both the parties and the dispute are relevant. And because both mootness and standing are jurisdictional doctrines defining the limits of the judicial power, our analytical approach to both should be consistent.

. Jenkins v. Swan, 675 P.2d 1145, 1149 (Utah 1983) (Inherent in the tripartite allocation of governmental powers is the historical and pragmatic conviction that particular disputes are most amenable to resolution in particular forums. The requirement that a plaintiff have a personal stake in the outcome of a dispute is intended to confine the courts to a role consistent with the separation of powers, and to limit the jurisdiction of the courts to those disputes which are most efficiently and effectively resolved through the judicial process."); Baird v. State, 574 P.2d 713, 717 (Utah 1978) ("To invoke judicial power to determine the validity of executive or legislative action, claimant must show that he has sustained or is immediately in danger of sustaining a direct injury as a result of that action. It is insufficient to assert a general interest he shares in common with all members of the public, viz., a generalized grievance.").

. In making this point, I am not suggesting that standing under the Utah Constitution must necessarily coincide in every particular with the federal doctrine of standing as articulated by the United States Supreme Court. Our Article VIII is not identical to its federal Article III counterpart, and there may well be differences in standing implied by the differences in the two provisions as historically understood. And the federal doctrine of standing has not always hewed consciously to the traditional conception of the federal judicial power. On occasion, the federal formulation of standing would appear to have been treated as a matter for case-by-case adjustment on grounds of pure judicial policy-grounds articulated without appropriate reference to the text or traditional understanding of the judicial power. See Hein v. Freedom From Religion Found., Inc., 551 U.S. 587, 609, 127 S.Ct. 2553, 168 L.Ed.2d 424 (2007) (refusing to apply the Flast v. Cohen, 392 U.S. 83, 106, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), exception to traditional standing rules-which allows taxpayer-standing where the constitutional provision allegedly violated is a specific limitation on the taxing and spending power-to encompass discretionary executive branch expenditures and recognizing that Flast has been confined to its facts). And where that has happened, we would certainly be free to reach our own independent *1121 judgment as to the appropriate limitations on our power-hopefully with reference to the governing text and its traditional understanding.

. For the same reasons, I am puzzled by the majority's insistence that the prescription of evolving "public interest" principles of standing is somehow "not the type of jurisprudential development ... requir[ing] explicit textual authorization." Supra 116 n.9. If the majority means to suggest that we have some sort of common-law authority to extend our constitutionally granted power, then I couldn't disagree more; any common-law authority we possess is foreclosed by the limiting text of the constitution. State v. Walker, 2011 UT 53, ¶ 34, 267 P.3d 210 (Lee, J., concurring) ("Where the judge's primary lawmaking authority has been usurped by legislative or constitutional enactments, he cannot ignore the original meaning of the law without exceeding the bounds of his judicial authority as a secondary interpreter and not a primary lawgiver."). And if, on the other hand, the court finds some sort of implicit textual authority in the constitution, then it is incumbent on the court to identify the implication it sees. Its failure to do so speaks loudly and reinforces for me what is both explicit and implicit in the grant of "judicial power," which is that we are constitutionally limited to exercise the kind of power that was traditionally, historically afforded to the courts in the issuance of "writs" and the decision of "cases."

. This point forecloses the majority's suggestion that the only constraint on our power (in a constitution lacking a "case or controversy" requirement) is the separation of powers proscription on our exercise of powers " 'appertaining to'" one of the other branches of government. See supra 112 n.4 (quoting Ura Const. art. V, § 1). That argument misses the core point. The power we possess under the constitution is limit *1122 ed to that which is "judicial" in nature. We may not act in a non-judicial manner-as by issuance of an advisory opinion-even if doing so does not tread on the powers of another branch of government.
That conclusion highlights the question for resolution here, which is whether a decision on a case falling outside the scope of our traditional doctrine of standing is an appropriate exercise of "judicial power." We should answer that question, as we did in Utah Transit Authority, with reference to the historical limits on the judicial power in our constitutional history. And if that history cuts against public interest standing, we should reject that doctrine as ultra vires under our constitution. For that same reason, the historical, established understanding of the judicial power is no mere "pragmatic conviction," but a constitutional requirement-one rooted in the notion of the "judicial power" that persists even "in the absence of a textual requirement of 'case or controversy' akin to those of the federal Article III." Supra 1 12 n.4.

. This, together with the extensive historical discussion below, is the answer to the question that the majority finds lacking in my opinion. See supra 116 n.9 (asserting that "the dissent does not suggest what does follow from our constitution's lack of a 'case or controversy' requirement"). What follows from the text and structure of our constitution is the conclusion that while our courts may not be limited to the resolution of what amounts to a federal "case or controversy," they are confined to the exercise of the "judicial power" in the issuance of "writs" and the decision of "cases." Our state constitutional regime may thus be quite close to that which governs our federal counterparts. Whatever the differences, it surely cannot be said that our judicial power is unfettered, or that it is subject to any evolving limits that we may wish to impose.

. Ann Woolhandler & Caleb Nelson, Does History Defeat Standing Doctrine?, 102 MicH. L. Rev. 689, 694 (2004) (''The question of which parties may properly come to court to vindicate ... different kinds of legal rights is central to the issue of standing.... [I]t is worth noting ... the ubiquity of the twin ideas of public control over public rights and private control over private rights [in early American cases)."); see California v. San Pablo & Tulare R.R. Co., 149 U.S. 308, 314, 13 S.Ct. 876, 37 L.Ed. 747 (1893) ("'The duty of this court, as of every judicial tribunal, is limited to determining rights of persons which are actually controverted in the particular case before it."); Bigelow v. Hartford Bridge Co., 14 Conn. 565, 579 (1842) ("[The very object of all suits, both at law and in equity," is "[to preserve and enforce the rights of persons, as individuals, and not as members of the community at large.").

. While the analysis is rooted in tradition and history, the core point is hardly new to this court. In Jenkins v. Swan, we concluded that "(the liability of one individual to another under the law ... is a matter of private rights" and that "[plrivate-rights disputes ... lie at the core of the historically recognized judicial power." 675 P.2d 1145, 1149 (Utah 1983) (second and fourth alterations in original) (internal quotation marks *1123 omitted). We should hew to that traditional understanding in this case.

. See 1 Jor Prentiss BisHor, Commentaries on tHE Law or Crminat ProcepurE § 26, at 15 (Boston, Little, Brown, & Co., 2d ed. 1872) ("In all the States of our Union, and in the tribunals of the United States, criminal prosecutions are carried on by a public officer, learned in the law, and chosen for this particular purpose.").

. See also, eg., Harrison v. Sterett, 4 H. & McH. 540, 548 (Md.Prov.Ct. 1774) (argument of counsel) ("[Plublic wrongs being a general injury to *1124 the community are to be redressed and punished by a public prosecution. ...").

. 1 Epwarp Coxe, Tus First Part or tus Institutes or tHE Laws or Encianp 56a (London, James & Luke G. Hansard & Sons 19th ed. 1832) (1628) {stating that "if any one man might have an action [for public nuisance], all men might have the like"); William B. Hale, Parties to Actions, in 15 Encyctoreoia or Preaping anp Practice 456, 473 (William M. McKinney ed., N.Y., Edward Thompson Co. 1899) {stating that the rule "prevent([s) a multiplicity of suits").

. 3 Wiruiam Bracekstong, Commentaries *219.

. Commonwealth v. Webb, 27 Va. (6 Rand.) 726, 729 (1828); see Pennsylvania v. Wheeling & Belmont Bridge Co., 54 U.S. (13 How.) 518, 566, 14 L.Ed. 249 (1851) ("[A] public nuisance is also a private nuisance, where a special and an irremediable mischief is done to an individual."); Coxe, supra note 12, at 56a (stating that a man may have "an action upon a [public nuisance] case" if he has "a particular damage" meaning "special damage, which is not common to others"); Hale, supra note 12, at 473 (same).

. The majority misses the essence of these cases in attempting to extend Crockett v. Board of Education, 58 Utah 303, 199 P. 158 (1921), to sustain standing for the Article VI petitioners in this case. See supra 127 n.14. That provision-like many others in our constitution and statutes could be said to be "designed for the public interest and benefit." Supra 127 n.14 (citing Laney v. Fairview City, 2002 UT 79, ¶ 34, 57 P.3d 1007). But the standing question for mandamus actions under our cases is not whether the law to be vindicated is designed to protect a "public *1126 interest" that encompasses the plaintiffs filing suit. It is whether the plaintiffs can be deemed to be vindicating a "special or peculiar interest" rather than "that of the general community" at large. Crockett, 199 P. at 160-61. The petitioner in Crockett was deemed to qualify because he was a member of a subset of the citizenry at large, but one specifically covered by a statute aimed at those "beneficially interested in having a statement prepared and published in the manner in which the law expressly and clearly enjoins." Id. at 161. The petitioner in Startup, by contrast, was simply a member of the community at large, one who was simply "interested as a citizen in seeing that the law was enforced." Startup, 203 P. at 641.
As explained in greater detail below, infra 11 117-18, the Article VI claimants in this case fall in the latter category. Their only interest is as citizens seeking enforcement of laws that protect all Utah citizens equally. If it is enough to sustain public interest standing to note that the law being vindicated is "designed for the public interest and benefit," nothing will be left of the key distinction in Crockett and Startup. The same can be said of any law, so the majority's argument must be rejected if we are to retain any semblance of a limit on the doctrine of standing.

. The majority recognizes this core point at a high level of generality, conceding that the judicial power is not unlimited and that there are "certain standing requirements" that "emanate from the principle of separation of powers." See supra 112 n.4 (internal quotation marks omitted). But the court fails to identify any such limitations, or to assess whether the public interest exception may exceed them. Thus, the court's concession stands as an acknowledgement that its decision may tread on the principle of separation of powers-without any analysis of whether it does so.

. Ann Woolhandler & Caleb Nelson, Does History Defeat Standing Doctrine?, 102 MicH. L. Rev. 689, 691 (2004) ("[There was an active law of standing in the eighteenth and nineteenth centuries. To be sure, early American courts did not use the term 'standing' much ....[blut eighteenth- and nineteenth-century courts were well aware of the need for proper parties, and they linked that issue to the distinction between public and private rights."); see Kendall v. United States ex rel. Stokes, 37 U.S. 524, 619, 12 Pet. 524, 9 L.Ed. 1181 (1838) (articulating a notion of the "judicial power" under which "private rights are to be enforced by judicial proceedings").

. Even proponents of "public right" standing recognize this failing. See John Dimanno, Beyond Taxpayers' Suits: Public Interest Standing in the States, 41 Conn. L. Rev. 639, 667 (2008) ("[It leaves a great deal-perhaps too much-discretion in the hands of judges, where somewhat subjective line-drawing inevitably occurs in distinguishing between those public actions worthy of adjudication and those that are not. Another concern is that in deciding whether the doctrine applies, judges must be sure to separate the issue of standing from the merits of the case, a difficult task for any adjudicator.").

. See Cedar Mountain Envtl., Inc. v. Tooele Cnty. ex rel. Tooele Cnty. Comm'n, 2009 UT 48, ¶ 9, 214 P.3d 95 (finding that the plaintiff met a statutory standing requirement-which incorporated the traditional standing test-before commenting on its standing under the alternative standing test); Haymond v. Bonneville Billing & Collections, Inc., 2004 UT 27, ¶ 6, 89 P.3d 171 (stating that plaintiffs failed to satisfy either the traditional or the alternative standing test).

. See SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc., 2001 UT 54, ¶ 47, 28 P.3d 669 (''Third-party beneficiaries are persons who are recognized as having enforceable rights created in them by a contract to which they are not parties and for which they give no consideration.... The contract must be undertaken for the plaintiff's direct benefit and the contract itself must affirmatively make this intention clear." (internal quotation marks omitted)).

. See Holmes Dev., LLC v. Cook, 2002 UT 38, ¶ 53, 48 P.3d 895 (stating that third-party beneficiaries of a contract have standing to sue under that contract).

. See Patterson v. Patterson, 2011 UT 68, ¶ 18, 266 P.3d 828 (considering a controlling statute not raised by the parties below and explaining that "we routinely consider new authority relevant to issues that have properly been preserved" and that "we have never prevented a party from raising controlling authority that directly bears upon a properly preserved issue").

. See Shurtleff v. Jay Tuft & Co., 622 P.2d 1168, 1172 (Utah 1980) ("A defendant has the right to have a cause of action prosecuted by the real party in interest to avoid further action on the same demand by another and to permit the defendant to assert all defenses or counterclaims available against the real owner of the cause.").

. See Lyon v. Bateman, 119 Utah 434, 228 P.2d 818, 824 (1951) ("We believe the departments of the state should be first given a fair opportunity to settle their differences before being harassed by litigants who seek to have the courts render advisory judgments prematurely.").

. Terracor v. Utah Bd. of State Lands & Forestry, 716 P.2d 796, 800 (Utah 1986) (stating that public interest standing did not exist because there were "others who could raise the same challenges raised by [plaintiff], and who would have a greater, more direct interest in doing so"); Jenkins v. Swan, 675 P.2d 1145, 1150 (Utah 1983) ("If the plaintiff does not have standing under the [traditional test], we will then address the question of whether there is anyone who has a greater interest in the outcome of the case than the plaintiff. If there is no one, and if the issue is unlikely to be raised at all if the plaintiff is denied standing, this Court will grant standing.").

. The troublesome nature of this standard is compounded by the requirement that it be assessed not just on appeal but also at the trial court level-and, thus, by a wide range of judges whose varying views on squishy matters of "importance" and "appropriateness" will assure even more arbitrariness in application. Trial courts will rarely be in a position to assess the admirability of anticipated briefing at the threshold stage at which they will be required to determine standing. And from the trial court perspective, the "importance" of or "public interest" in an issue and the "appropriateness" of a plaintiff will likely feel suspiciously like a full-scale review of the merits of the issues. The majority's formulation of public interest standing ignores this problem, treating the matter as one left only for appellate courts to resolve. That leaves the first-line judges charged with addressing standing (trial courts) completely adrift. It also assures not only arbitrariness but protracted appeals and litigation.

. And we have done so, moreover, in a manner that threatens the rights and interests of the underlying real parties in interest. I rather doubt that the real parties with individualized interests implicated by SB 2 would find their decision not to sue irrelevant. In opening the door to citizen suits supplanting claims otherwise belonging to real parties with distinct claims, we have allowed standing that threatens the integrity of the real party in interest doctrine. If this approach is taken seriously in future cases-and not, as may be the case, a one-time excuse to reach the merits in a case where they would otherwise be beyond our reach-we will surely rue this day, and just as surely be called on to dial back on this and other elements of today's opinion.

. The court seeks to answer this concern with the assurance that its decision is based "on the text and structure of our constitution" and not on "'its own beliefs." Supra 132 n.18. That is unsatisfying, as the court points to nothing in the text or structure of the constitution that makes Article VI claims more important than Article X claims. It may be true, as the majority states, that Article VI "express[es) the intent of the people to limit legislative power and prevent special interest abuse." Supra I 32 n.18 (internal quotation marks omitted). But Article X is a parallel limitation: In conferring power on the State Board of Education to control and supervise the public education system, Article X withholds that power from everyone else-including the legislature. See Utax Const art. X, § 3. Thus, *1132 both Article VI and Article X constitute limitations on the legislative power. If the former limitations are fundamentally important, then so are the latter.

. In a sense, the Article X claims seem more fundamental than their Article VI counterparts, in that the former constitute substantive, separation-of-powers limits on governmental power (power reserved for the Board of Education), while the latter comprise only procedural rules for lawmaking (single-subject and clear-title requirements). If asked for my subjective assessment of the relative importance of the two sets of claims before us, I suppose I would tend to elevate the Article X claims above the Article VI claims on this basis. In any event, the court offers no basis for a contrary conclusion.
On the other hand, this factor is also problematic at its core. Public interest or importance may often cut against the propriety of the exercise of judicial power. The matters of greatest societal interest-involving a grand, overarching balance of important public policies-are beyond the capacity of the courts to resolve. The majority acknowledges this concern, noting that " 'the more generalized the issues, the more likely they ought to be resolved in the legislative or executive branches.'" Supra 131 {emphasis omitted) (quoting Utah Chapter of the Sierra Club v. Utah Air Quality Bd., 2006 UT 74, ¶ 39, 148 P.3d 960). But the court ultimately fails to give effect to this principle. The Article VI claims presented implicate issues that are among the most generalized one could imagine-involving structural restrictions on the legislative process, which affect all citizens in a general, undifferentiated manner. Although these seem to be precisely the sort of generalized matters calling for deference to the legislative process, the court dismisses this concern on the ground that resolution of this case does not run afoul of political question doctrine. Supra 1 31. That is unpersuasive. The justiciability bar to resolution of political questions is analytically distinct from the limits of the doctrine of standing. The latter focuses on the nature of the claimant's interest; the former concerns itself with the nature of the legal standard implicated by that interest. Each is a separate hurdle, and clearing one hurdle (political question) does not erase the need to clear the other (standing).

. See Raines v. Byrd, 521 U.S. 811, 829-30, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (denying standing to congressmen alleging only wholly abstract and widely dispersed institutional injury from dilution of legislative power where none were authorized to represent their respective houses and where both houses opposed the suit); see also People Who Care v. Rockford Bd. of Educ., 179 F.R.D. 551, 562 (N.D.Ill. 1998) (holding that "petitioners' status as School Board members does not permit them to step into the shoes of the [School Board] and invoke its right to appeal").

. It is perhaps for these reasons that some states either refuse to recognize "public interest" standing or maintain traditional standing requirements. See, eg., Henderson v. Miller, 228 Ill.App.3d 260, 170 Ill.Dec. 134, 592 N.E.2d 570, 575 (1992); Weinlood v. Simmons, 262 Kan. 259, 936 P.2d 238, 244 (1997) ("Interests to protect the public at large must be brought by the proper public official."); 120 W. Fayette St., LLLP v. Mayor of Baltimore, 407 Md. 253, 964 A.2d 662, 669-70 (2009) (stating that taxpayer standing is granted when the disputed action "may result in a pecuniary loss to the taxpayer or an increase in taxes"), superseded on other grounds by statute as stated in Patuxent Riverkeeper v. Md. Dep't of the Env't, 422 Md. 294, 29 A.3d 584, 586 (2011); In re Sandy Pappas Senate Comm., 488 N.W.2d 795, 797-98 (Minn.1992) (maintaining an "injury in fact'' requirement); City of Chattanooga v. Davis, 54 S.W.3d 248, 280-81 (Tenn.2001) (expressly refusing to adopt "public rights" standing); Goldman v. Landsidle, 262 Va. 364, 552 S.E.2d 67, 72 (2001) (refusing to recognize general, state taxpayer standing).